[No. C050008. Third Dist. Apr. 4, 2006.]

JASON TAYLOR et al., Plaintiffs and Respondents, v.
ROSEVILLE TOYOTA, INC., Defendant and Appellant.

**COUNSEL**

The Costa Law Firm and Daniel P. Costa for Defendant and Appellant.

Gurnee & Daniels and David M. Daniels for Plaintiffs and Respondents.

## OPINION

**CANTIL-SAKAUYE, J.**—Derrick Lewis, an employee of Roseville Toyota, Inc., was driving a car owned by Roseville Toyota on a personal errand on his lunch break when he rear-ended a car stopped at a stoplight. The driver and passenger of such car, Jason and Amy Taylor (plaintiffs), filed an action against Lewis and Roseville Toyota for personal damages resulting from the accident. A jury found by special verdict Lewis was negligent, his negligence was a substantial factor in causing harm to plaintiffs, and while Lewis was not acting within the scope of his employment, Roseville Toyota had given Lewis permission, by words or conduct, to use its car at the time of the accident. Roseville Toyota was found liable for a total of $277,662 in damages. Roseville Toyota appeals both the judgment and the trial court's subsequent order denying its motion for judgment notwithstanding the verdict.

Roseville Toyota contends the jury's finding of permissive use was not supported by substantial evidence, the trial court should have granted the judgment notwithstanding the verdict because of the insufficiency of the evidence, and the trial court erred in instructing the jury with plaintiff's special jury instruction regarding the factors that the jury could consider in deciding the question of permission. We shall affirm.

### BACKGROUND

We limit our discussion of the evidence presented at trial to the evidence relevant to the issue of permission, the focus of this appeal.

Roseville Toyota, a new and used vehicle dealership, has in place a system for controlling access to the keys to its vehicles. All keys are kept in a key

control shack by a key shack attendant. When a salesperson, mechanic, detailer, porter, or vendor wants to move a Roseville Toyota vehicle, they must go up to the window of the key control shack and fill out a key "tag" or key request form. The tag contains a space for the date, the time, the stock number of the vehicle, the name of the person who is checking the keys out, and where the vehicle is going. Examples of where a vehicle might be taken include a demo or test drive, to the location of various vendors for paint restoration, dent repair or tire replacement, to Roseville Toyota's used vehicle lot, to Roseville Toyota's secondary storage lot, to the gas station, or to the detail line for washing and cleaning. Every time a person checks out a vehicle, it is for a company or business use or purpose. If the vehicle is going to be gone for an extended period of time, such information might be put on the key tag. However, it was not necessary to put an expected return time on the tag. Occasionally, the key shack attendant fills out the tag for the person requesting the keys. When the tag is completed, the key shack attendant fills out a key control log with the information from the tag, gives the keys to the person requesting them, and hangs the tag on the board in the shack. More than one key can be checked out at a time. The tags stay on the board until the vehicle is returned.

A person getting keys to a vehicle through the key control shack procedure has implied permission to take the vehicle to do their prescribed duty. There is no real control over when the vehicle comes back, although there is an unwritten policy that keys are not taken home. When the vehicle is returned, the key shack attendant crosses out, with a colored highlighter, the check-out entry for the vehicle on the key control log. The tag either gets returned to the person who checked out the keys if they want it or it is thrown away. Nothing is marked on the log to show who returned the vehicle or when it was returned. A new page of the key control log is started each day and if a vehicle is returned on a subsequent day, the key shack attendant may or may not go back to the earlier log to highlight the entry indicating the return of the vehicle. Some vehicles may be moved to another lot and sold from there. A manager from the other lot should call the key shack attendant to let them know the vehicle will not be returning. At least one log showed vehicles being checked out at 2:00 p.m. for detail work, which would normally take one to three hours, which were not returned that day by 11:00 p.m.

Sometimes vendors returning vehicles would see the detail line was empty or running low. They would drive the vehicle they were returning to the detail area and leave the vehicle and its keys with one of the detailers. This was acceptable to Roseville Toyota. A detailer getting keys this way would have implied permission to take the vehicle to perform his or her duties.

Dennis Moore, the used car service manager for Roseville Toyota, and Jason Castillo, the detail manager for Roseville Toyota at the time of

plaintiff's accident, hired Lewis in September 2000 to be a detailer. A detailer cleans vehicles, puts gas in vehicles, transfers vehicles between the main new vehicle sales location and the used vehicle sales lot, and maintains the showroom and vehicle lots. Detailers have access to keys to Roseville Toyota vehicles through the key control shack procedure. On Lewis's first day of work Castillo sat down with him and reviewed Lewis's job duties and responsibilities as a detailer. Castillo gave Lewis a copy of the company handbook, Lewis signed for it, and the payroll clerk for Roseville Toyota went over each item and page of the handbook with Lewis while Castillo was present. The handbook provided, "[u]nauthorized use of Company property, vehicles, tools, equipment, or facilities is prohibited. Personal use of the postage meter, photocopy machines and telephones is not allowed." Castillo explained to Lewis that employees of Roseville Toyota are not given permission to use vehicles for their own personal use. The business manager of Roseville Toyota testified it was the strict policy of Roseville Toyota that no employee use property of Roseville Toyota for their own personal use.

Lewis testified on the day of the accident he asked Tina Campbell, the key shack attendant, to use a car. He believed the car, a Cavalier, was a rental car. Lewis asked Campbell if he could use it for 30 minutes on his lunch break to go over to his mother's house. According to Lewis, Campbell told him it was fine as long as he brought it back because she could get in trouble for it. Lewis got the keys from Campbell, clocked out for his lunch break and left. Lewis was on his way back to the dealership when he got in the accident with plaintiffs. When he spoke to a police officer at the scene, Lewis told the officer he was on a lunch break for his job and that he had permission to drive the car, except that his boss did not know he had it. Lewis said he was referring to Moore when he told the officer his boss did not know he had the car. According to Lewis, his immediate supervisor, Castillo, saw him leave the car lot after Campbell gave him the keys.

When asked if he understood he was not supposed to use company property for his own personal use, Lewis testified he thought it was fine to use the car for his personal errand if his supervisor and the key shack attendant knew about it. He said he had not been working at Roseville Toyota very long; it was "not like I was working there six months or a year or something and I knew better." He agreed he was given the handbook when he started his employment, but the handbook said only unauthorized use was not allowed. When the key shack attendant gave him the keys, he thought he was authorized. Moreover, the handbook said the company could change any policy without prior notice, so Lewis thought the "handbook doesn't practically mean anything." Lewis denied being told by Castillo that personal use of vehicles was not allowed and did not remember his deposition answer suggesting otherwise.

The key control log for the date of the accident did not have an entry reflecting Lewis being given the keys to the Cavalier. Campbell testified she gave a set of keys to Lewis, but was confused over whether those were the keys to the car involved in the accident. She did not recall Lewis ever requesting keys to use a car for personal use or asking for keys so he could go to his mother's house. The business manager for Roseville Toyota testified if Campbell had said it was okay to take the car for personal use, it would have been a violation of company policy and Campbell would have been terminated right away.

Castillo did not know how Lewis got the keys to the car he drove in the accident. He suggested Lewis could have gotten them from a vendor who passed them on.

The police officer who took a statement from Lewis at the scene of the accident testified Lewis stated his boss did not know he had the vehicle. Lewis never told the officer he had permission to use the vehicle.

Moore investigated the incident when he came to work the following morning. He inspected the damaged Cavalier, which had been towed back to Roseville Toyota, and inventoried Lewis's belongings found in the car. He asked where Lewis was, asked about the police report, and reported the incident to the business manager. He asked Campbell about the keys and was told she did not give the keys to Lewis. Moore could not remember if he checked the key control log for the stock number of the Cavalier. He decided Lewis should be fired for just cause.

When Lewis came into the office two or three days later, Lewis told Moore and Brian Wright, the used car assistant manager, a number of inconsistent stories that did not check out. When told to write down what really happened, Lewis said he took the car to go to his mother's house to retrieve some clothes his stepdad threw out in the yard. He wrote: "I was coming back from my Mother's house from getting clothes. On the way from there I ran into the back of a 99 Honda Accord. I was driving a Blue Chevy Caviler [sic]." Although not specifically asked, Lewis did not tell Moore and Wright he had permission to drive the Cavalier during his lunch break, that Campbell gave him the keys or that Campbell knew he was going to his mother's house. According to Moore, Lewis did not have permission to take the car for his own personal use; no employee did. Moore said he had no other problems with any other employees taking cars or problems with cars being missing. Moore fired Lewis for misappropriation of company property, willful and gross neglect, and destruction of company property. When fired, Lewis did not appear upset or angry. He did not appear to disagree with his termination.

Lewis's mother called some time later and reported another Roseville Toyota car was being used by Lewis's ex-wife. Lewis was subsequently prosecuted for and convicted of stealing that car.

## DISCUSSION

### I.

### Plaintiff's Special Jury Instruction Number Two

As it will aid our discussion of the sufficiency of the evidence, we will first address Roseville Toyota's claim of instructional error.

To place our discussion in context, we note plaintiff's action sought to impose liability on Roseville Toyota, in part, as the owner of the car driven by Lewis. In this regard, Vehicle Code section 17150 (section 17150) provides: "Every owner of a motor vehicle is liable and responsible for death or injury to person or property resulting from a negligent or wrongful act or omission in the operation of the motor vehicle, in the business of the owner or otherwise, by any person *using or operating the same with the permission, express or implied, of the owner.*" (Italics added.)

Roseville Toyota proposed and the trial court gave the jury instruction on the issue of Lewis's permissive use of Roseville Toyota's vehicle in a modified form of CACI No. 720.[1] In addition, plaintiffs proposed two special jury instructions related to the issue of permission. Roseville Toyota objected to the second proposed special instruction on the grounds (1) it asserted an incorrect statement of law, unsupported by the cited legal authority, and (2) it was "irrelevant, misleading and prejudicial due to the fact that the issue in this case was whether . . . Lewis had permission to use the vehicle for his own 'personal use' and not whether he had permission to drive the car or whether such permission was 'implied.' "

After discussion with the parties, the trial court gave a modified version of plaintiff's proposed special jury instruction as follows:

---

[1] The instruction given stated: "Jason and Amy Taylor claim that they were harmed and that Roseville Toyota is responsible for the harm because Roseville Toyota gave Derrick Dewayne Lewis permission to operate the vehicle. To establish this claim, Jason and Amy Taylor must prove all of the following: [¶] 1. That Derrick Dewayne Lewis was negligent in operating the vehicle; [¶] 2. That Roseville Toyota was an owner of the vehicle at the time of the injury to Jason and Amy Taylor; and [¶] 3. That Roseville Toyota, by words or conduct, gave permission to Derrick Dewayne Lewis to use the vehicle. [¶] In determining whether permission was given, you may consider the relationship between the owner and the operator."

"An owner of a motor vehicle may give express or implied permission to another to use the owner's vehicle. Express permission is a specified authorization to use a vehicle owned by another. Implied permission can be inferred from the relationship of the parties or the circumstances of a particular use. In determining whether implied permission existed in this case, factors that you may consider include;

"1. If the owner was the employer of the operator;

"2. If there may have been a custom or practice of allowing employees to use company owned vehicles;

"3. *If the owner either failed to monitor or supervise the use(s) of its vehicles(s)*[.]" (Italics added.)

Roseville Toyota claims on appeal the giving of this instruction was prejudicial legal error, primarily because the third factor in the instruction was not supported by the cases cited by plaintiffs.[2] In support of its claim of prejudice from the giving of the instruction, Roseville Toyota points to a juror declaration submitted in connection with its motion for new trial below.

In support of their request for the special instruction plaintiffs cited three cases, *Elkinton v. California State Automobile Assoc.* (1959) 173 Cal.App.2d 338 [343 P.2d 396] (*Elkinton*), *Reed v. Cortez* (1948) 88 Cal.App.2d 416 [198 P.2d 911] (*Reed*), and *Blank v. Coffin* (1942) 20 Cal.2d 457 [126 P.2d 868] (*Blank*). Roseville Toyota complains none of these cases stand for the proposition that the fact the owner either failed to monitor or supervise the use

---

[2] Roseville Toyota also claims the effect of instruction 2 was "to articulate a negligence standard with respect to the maintenance of keys, which effectively created a new cause of action . . . for negligent supervision or entrustment of its keys." This appears to reference a fourth factor set out in plaintiffs' *proposed* instruction that the jury could consider whether "the owner created a situation which made it easy for the operator to obtain the keys to and use the vehicle." Such fourth factor was deleted by the trial court when it modified the proposed instruction. As Roseville Toyota does not explain by argument with supporting authorities how the instruction actually given creates a negligence standard for maintenance of its keys, we need not further address this contention. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834] (*Kim*); Cal. Rules of Court, rule 14(a)(1)(B) & (C).)

In a footnote in its opening brief, Roseville Toyota appears to reassert its claim the proposed instruction was irrelevant, as it claimed in the second part of its objection to the trial court. As a point merely asserted without argument or authority, this contention is also forfeited. (*Kim, supra,* 17 Cal.App.4th at p. 979; Cal. Rules of Court, rule 14(a)(1)(B) & (C).)

Roseville Toyota also raises for the first time in its reply brief, without offering any good reason why it did not raise it in its opening brief, a claim that the second factor in the proposed instruction was misleading. It is improper to raise new contentions in the reply brief. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) Therefore, this contention is forfeited.

of its vehicles is a factor in determining implied permission. While it is true none of these cases includes specific language regarding the owner's failure to monitor or supervise the use of the vehicle, at least two of the cases do suggest such a factor could be relevant under the circumstances of a particular case.

In *Elkinton, supra,* 173 Cal.App.2d 338, the court concluded substantial evidence supported the jury's finding that a daughter had her mother's implied permission to drive her mother's car. (*Id.* at p. 345.) The court pointed to evidence that the keys were accessible to the daughter, the mother had shown the daughter how to start a car, had never told the daughter she could not drive the mother's car, the mother knew her daughter was driving other vehicles and may have known the daughter had previously driven the mother's car, but still had not made the keys inaccessible, and the mother had expressed a desire the daughter learn to drive and secure a driver's license in the near future. (*Ibid.*) Reviewing the evidence in light of the authority which the law confers on a parent to control a child's actions and the reality that children are apt to consider a parent's indifference as tacit permission, the court concluded the combination of these facts could be found by the jury to amount to implied permission. (*Id.* at pp. 344–345.) Such facts involved a measure of failure by the mother to monitor and supervise or control her daughter's actions.

■ Roseville Toyota distinguishes *Elkinton* as a case involving a family situation and not an employer and employee. However, the court in *Elkinton* stated, "Where the issue of implied permissive use is involved, the general relationship existing between the owner and the operator, is of paramount importance." (*Elkinton, supra,* 173 Cal.App.2d at p. 344.) It then gave examples of relationships where weaker direct evidence will support a finding of permissive use, including both family relationships and principal/agent relationships. (*Ibid.*) Each of the cases cited by *Elkinton* as examples of the principal/agent relationship was a case involving an employer/employee relationship. (*Prickett v. Whapples* (1935) 10 Cal.App.2d 701 [52 P.2d 972]; *Scheff v. Roberts* (1950) 35 Cal.2d 10 [215 P.2d 925]; *Blank, supra,* 20 Cal.2d 457.) There is no suggestion in *Elkinton* that such relationships would be governed by different rules. Indeed, in the employer/employee relationship the employer also has a legal right to control the actions of the employee and a failure to do so may be taken as tacit permission, a fact the *Elkinton* court found significant in the family context. (*Elkinton, supra,* at p. 344.)

■ In the case of *Blank, supra,* 20 Cal.2d 457, the California Supreme Court concluded a jury may infer a driver is operating a vehicle with the permission of the owner from evidence the driver was an employee of the owner. (*Id.* at p. 460.) The employer could introduce evidence to show permission was not given, but unless such evidence was "clear, positive, uncontradicted, and of such a nature that it can not rationally be disbelieved,"

the issue would be a question for the jury. (*Id.* at p. 461.) In the case before it, the Supreme Court found the following facts justified the jury in concluding the employee was driving with the tacit permission of the employer: the employee was given exclusive possession of the car; he kept it in his own garage without charge to the company; the manual of instructions the employee received forbade the use of the car on vacations, but did not forbid its use for personal matters; the employer could determine the employee was habitually using the car for his personal business by checking his mileage reports against his gasoline reports; and the employee was not fired after discovery of his use of the car on a weekend trip, but was allowed to resume possession of the car after a short layoff. (*Id.* at p. 462.)

While the Supreme Court did not expressly discuss in *Blank* the employer's failure to monitor or supervise the use of its car, the court did point out the employer could have, and presumably did not, check the employee's mileage and gasoline reports to determine if there had been personal use as a fact supporting implied permission. This is a form of failure to monitor the use of the car and suggests such factor can be relevant to the issue of implied permission.

As plaintiffs point out, other cases have also considered an employer's failure to check gas, oil or mileage for unauthorized use of the car as part of the circumstances showing the employer's implied permission. (*Brown v. Aldrich* (1947) 77 Cal.App.2d 693, 694 [176 P.2d 89]; *Flemmer v. Monckton* (1946) 73 Cal.App.2d 271, 276 [166 P.2d 380].) These cases support the idea that a failure to monitor can be a relevant factor for permission.

In addition, as plaintiff notes, the California Supreme Court in *Burgess v. Cahill* (1945) 26 Cal.2d 320 [158 P.2d 393] concluded that the employer/employee relationship, along with the fact the employer gave exclusive possession and permission for the use of the vehicle to its employee without restrictions on its use and without effort to check mileage or consumption of gas "or otherwise supervise or limit the use of the car," supported an inference the vehicle was being driven with the permission of the employer. (*Id.* at p. 324.)

The case of *Reed, supra,* 88 Cal.App.2d 416, cited by plaintiffs in support of their proposed instruction, involved an employer/employee relationship. The employee had driven the employer's car to a dance on a weekend where he became intoxicated and later was involved in a vehicle accident when he was driving home. (*Id.* at p. 418.) Noting the law was settled that an inference of permission arises by virtue of the employer/employee relationship (*Blank, supra,* 20 Cal.2d at p. 460), the court in *Reed* reasoned the jury could have rejected the employer's contrary evidence. (*Reed, supra,* at pp. 420–421.) The court concluded the issue was one of fact for the jury and substantial

evidence supported the jury's finding. (*Id.* at p. 421.) We agree the court in *Reed* made no mention of the employer monitoring or supervising the employee. Such case supported other portions of plaintiffs' proposed instruction.

After reviewing the case law supporting the use of the factor and finding no case stating an employer's failure to monitor or supervise the use of its vehicles is not a relevant factor, we conclude the third factor stated in plaintiffs' proposed instruction was a correct statement of the law. Having so concluded, we need not address the issue of prejudice or the propriety of using the juror's declaration to show prejudice.

## II.

### Sufficiency of the Evidence to Support the Jury's Finding of Permissive Use

We turn now to the question of whether substantial evidence supports the jury's finding Roseville Toyota, by words or conduct, gave permission to Lewis to use the vehicle at the time of the accident. We conclude it does.

In reviewing the sufficiency of the evidence, " 'the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact.' [Citations.]" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362], original italics.) "[A]ll conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; see *Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 398 [185 Cal.Rptr. 654, 650 P.2d 1171]; *Elkinton, supra,* 173 Cal.App.2d 338, 343.) A reviewing court will not reweigh the evidence. (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834].)

"The 'permissive use' envisioned by [section 17150] as a prerequisite for imposing liability on the vehicle owner has been considered to be that use expressly or impliedly within the scope of permission as to time, place and purpose, as granted by the owner." (*Hartford Acci. & Indem. Co. v. Abdullah* (1979) 94 Cal.App.3d 81, 88 [156 Cal.Rptr. 254].) "The existence of the requisite permission . . . is to be determined by the trier of fact based on all the circumstances and inferences reasonably to be drawn therefrom." (*Fremont Co. Ins. Co. v. Hartnett* (1993) 19 Cal.App.4th 669, 674 [23 Cal.Rptr.2d 567]; accord, *Peterson v. Grieger, Inc.* (1961) 57 Cal.2d 43, 51 [17 Cal.Rptr. 828, 367 P.2d 420].) While the question of permission cannot be left to speculation

or assumptions (*Marquez v. Enterprise Rent-A-Car* (1997) 53 Cal.App.4th 319, 322 [61 Cal.Rptr.2d 557]), "[w]here the trier of fact has drawn an inference of implied permission from conflicting evidence, and such inference is reasonable and supported by substantial evidence, the appellate court may not interfere with the trier's factual conclusion of permissive use. [Citation.]" (*Fremont Co. Ins. Co. v. Hartnett, supra,* at pp. 674–675.) "The trier of fact, as the exclusive judge of the credibility of witnesses, is not required to believe the owner's denial of having given permission, if there is other evidence warranting the inference of permission." (*Id.* at p. 675.)

Viewing the facts in favor of the judgment, as we must, we assume the jury believed the testimony of Lewis that Campbell told him it was okay to use a Roseville Toyota car for his personal errand during his lunch break as long as he brought the car back. Although there was no evidence Campbell had actual authority to give this express permission to Lewis to use the car, there is sufficient evidence of Campbell's ostensible authority to give such permission.

Ostensible authority is authority that the principal, either intentionally or by lack of ordinary care, causes or allows a third party to believe the agent possesses. (Civ. Code, § 2317.) Ostensible authority is based on the principle of estoppel, and requires the essential elements of estoppel, i.e., representation, justifiable reliance, and changed position as a result of the reliance. (*Preis v. American Indemnity Co.* (1990) 220 Cal.App.3d 752, 761 [269 Cal.Rptr. 617].) Ostensible authority must be based on the acts or declarations of the principal and not solely upon the agent's conduct. (*Kaplan v. Coldwell Banker Residential Affiliates, Inc.* (1997) 59 Cal.App.4th 741, 747 [69 Cal.Rptr.2d 640].)

Roseville Toyota set up an elaborate procedure for keeping track of the keys to its vehicles. Roseville Toyota placed the key shack attendant, Campbell, in the central position of such procedure as the gatekeeper of access to the keys and thereby, its vehicles. Salesmen, mechanics, porters, and detailers—in short all of the employees Roseville Toyota authorized to obtain access to its vehicles—could get the keys to Roseville Toyota vehicles by going through the key shack control procedure. There was no evidence such employees had to get authorization from their immediate supervisor or any other person at Roseville Toyota before they could request a key from the key shack attendant. The key shack attendant was the sole person designated by Roseville Toyota to control access to its vehicle keys and vehicles. There was testimony if a person got keys from the key shack attendant, that person had Roseville Toyota's permission to use the vehicle. Therefore, there was evidence from which the jury could believe that Roseville Toyota represented and allowed third parties to believe the key shack attendant had the authority to permit employees to check out its vehicles.

Although it appears there was a firm unwritten policy that no employee could use a vehicle for personal use, the employee handbook, provided to all employees including Lewis, only stated "unauthorized" use of vehicles was prohibited. The very next sentence stated "personal" use of postage machines, photocopiers, and telephones was expressly prohibited, suggesting other personal use of Roseville Toyota property, like a vehicle, was allowed if authorized. The jury could have chosen to disbelieve the testimony of Castillo that he specifically told Lewis on his first day of employment that no personal use of vehicles was allowed and believed Lewis was only told what was written in the handbook. The jury could have reasoned, as plaintiffs argued in closing, that Castillo was potentially biased in favor of Roseville Toyota. Although at the time of trial he was a former employee, Castillo was on the job and in charge at the time Lewis was given the keys and at the time of the accident. He could naturally be defensive, not wanting to be blamed for the ensuing events. (*Scheff v. Roberts, supra,* 35 Cal.2d 10, 15; *Flemmer v. Monckton, supra,* 73 Cal.App.2d 271, 275.) Moreover, Lewis denied at trial that he was ever told personal use was not allowed. Lewis had been an employee only a couple of weeks at the time of the accident, perhaps not long enough to become aware of any undisclosed, unwritten rule disallowing personal use.

Plus, even if the jury thought Lewis was expressly told of the unwritten policy against personal use, the jury could have concluded Lewis, in his few short weeks there, reasonably believed exceptions could be made. As a detailer he would likely be aware of at least one example where the key control procedures were not always enforced. Specifically, although the only method of getting keys was supposed to be through the key shack attendant, Roseville Toyota apparently approved, or at the very least failed to prohibit, detailers getting keys directly from vendors on occasion.

Nor does the testimony of Lewis that Campbell told him he could take the car as long as he brought it back "because she could get in trouble for it" necessarily indicate Lewis was on notice Campbell was not authorized to give out keys for personal use. Lewis could have understood the statement to mean Campbell would get in trouble only if he did not bring the car back.

In summary, the jury could have found Lewis reasonably believed Campbell had the authority to authorize his use of the Cavalier for his personal errand.

Substantial evidence also supports a finding of implied permission by Roseville Toyota of Lewis's personal use of their vehicle.

It is settled law a jury may infer an employee is operating an employer's vehicle with the permission of the owner/employer just from the relationship

of employer/employee. (*Blank, supra,* 20 Cal.2d at p. 460; *Reed, supra,* 88 Cal.App.2d at p. 420.) The jury could have rejected Roseville Toyota's contrary evidence. (*Reed, supra,* at pp. 420–421.) Drawing every inference in favor of the judgment, there was an evidentiary basis to do so.

■ As we have already noted, Roseville Toyota's restriction of its employees' use of its vehicles to solely business purposes was not specifically reflected in its written employee handbook. The handbook only said vehicle use had to be authorized. It did not include vehicles in its express prohibition against personal use of property. In addition, as we discussed in connection with Roseville Toyota's claim regarding plaintiffs' special jury instruction, the jury could consider evidence regarding Roseville Toyota's failure to monitor or supervise the use of its vehicles as showing tacit permission. There was evidence Roseville Toyota did not check where its vehicles went or were located once the keys were given out by the key shack attendant. Roseville Toyota did not require an estimated return time be placed on the key tag. It did not confirm where its vehicles were at the end of the day, even when they had been checked out for purposes requiring only a couple of hours of work. It allowed multiple vehicles to be checked out at one time. It did not have a system requiring the key shack attendant to go back to the date in the previous logs when the vehicle was first checked out to complete the record of the return of the vehicle on a subsequent day. Key control logs were not marked to show the time a vehicle was returned or who returned it so that Roseville Toyota could tell if a vehicle was gone too long or if keys had been passed from one person to another. There was no evidence the gas, oil or mileage of the vehicles was checked when they were returned. The jury could have found such evidence of Roseville Toyota's business practice amounted to indifference to the exact use of its vehicles on the part of Roseville Toyota and therefore, tacit permission to use the vehicles for purposes other than strictly business.

Substantial evidence supports the finding of the jury of permissive use.

## III.

### The Trial Court's Denial of Roseville Toyota's Motion For Judgment Notwithstanding the Verdict

We have just seen that substantial evidence supports the verdict. As the same rules apply to a review of an order denying a motion for judgment notwithstanding the verdict (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [104 Cal.Rptr.2d 602, 18 P.3d 29]; *Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d

266]; *Elkinton, supra,* 173 Cal.App.2d at p. 348), it follows that the trial court properly denied Roseville Toyota's motion.

## DISPOSITION

The judgment and order denying appellant's motion for judgment notwithstanding the verdict are affirmed. Costs on appeal are awarded to respondents. (Cal. Rules of Court, rule 27(a).)

Sims, Acting P. J., and Morrison, J., concurred.